UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER CAROVILLANO *and* STEVEN BRANDT, *on behalf of themselves and all others similarly situated*,

                            Plaintiffs,

                            -v-

SIRIUS XM RADIO INC.,

                            Defendant.

23 Civ. 4723 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Defendant Sirius XM Radio Inc. ("Sirius XM") moves for partial summary judgment as to plaintiffs' waiver of their right to proceed as class representatives, and accordingly moves to strike plaintiffs' class allegations. For the reasons that follow, Sirius XM's motion is granted.

I.    Background[1]

    A.    Factual Background

This case arises from the business practices of Sirius XM, a satellite-radio provider with more than 33 million customers nationwide. Def. 56.1 ¶ 1. Plaintiffs Christopher Carovillano

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion. These are: Sirius XM's Rule 56.1 statement, Dkt. 41 ("Def. 56.1"); the declarations in support of the motion, plus attached exhibits, of Jeff Myers, Dkt. 42 ("Myers Decl."), Navin Narasimha, Dkt. 43 ("Narasimha Decl."), Lenny Fried, Dkt. 44 ("Fried Decl."), Michael Cristofaro, Dkt. 45 ("Cristofaro Decl."), and Eric Stephens, Dkt. 46 ("Stephens Decl."); plaintiffs' response to Sirius XM's Rule 56.1 Statement, Dkt. 47, Ex. 1 ("Pl. 56.1"); the declaration in opposition to the motion, plus attached exhibit, of Stephen DeNittis, Dkt. 47, Ex. 2 ("DeNittis Decl."); and the reply declaration of Eric Stephens in further support of the motion, plus attached exhibits, Dkt. 50 ("Stephens Reply Decl."). The transcripts of various depositions are cited herein, including those of plaintiff Steven Brandt, Dkt. 47, Ex. 5 ("Brandt Dep."), plaintiff Christopher Carovillano, Dkt. 47, Ex. 6 ("Carovillano Dep."), Sirius XM corporate designee Lenny Fried, Dkt. 47, Ex. 3 ("Fried Dep."), Sirius XM corporate designee Jeffrey Myers, Dkt. 47, Ex. 9 ("Myers Dep."), and Sirius XM corporate designee Navin Narasimha, Dkt. 47, Ex. 13 ("Narasimha Dep."). Also cited is the Complaint, Dkt. 1 ("Compl."), the version of the Customer Agreement in force at the time

1

and Steven Brandt allege that Sirius XM failed to properly disclose certain fees charged to subscribers. Compl. ¶¶ 1–12. They seek to represent a class of Sirius XM subscribers who signed up for music plans over the phone. *Id.* ¶¶ 84–85.

### 1. Sirius XM's General Practices

Sirius XM has agreements with various auto manufacturers to provide new car buyers and renters with a free trial of Sirius XM's radio service. Fried Dep. 18. These trial users automatically receive the service without having to take any affirmative steps. *Id.* at 18–19. After the trial period elapses, Sirius XM attempts to convert these users into paying subscribers with promotional materials and special rates. *See id.* at 21. Trial users may subscribe by going to Sirius XM's website; by mailing Sirius XM an order form; or, as relevant here, by calling Sirius XM. *See* Fried Decl., Ex. 2 at 4.

When trial users sign up for paid subscriptions over the phone, Sirius XM representatives follow a script that discloses certain key terms, including the price, length of subscription, and cancellation policy. Def. 56.1 ¶¶ 11–12. As part of the script, the representative informs each customer: "Your Customer Agreement, including the refund policy, can be found on our website at siriusxm.com or you can request it at any time by phone." The representative then asks if the customer accepts "these terms." *E.g.*, Brandt 2022 Call Tr. 5–6; Brandt 2023 Call Tr. 7; Carovillano Tr. 5.

Sirius XM's practice is to send confirmation emails to customers within five days of a transaction. Def. 56.1 ¶ 13. These emails typically state that the customer's "subscription is

---

plaintiffs subscribed to Sirius XM, Dkt. 13, Ex. 1 ("Customer Agreement"), transcripts of Brandt and Carovillano's phone calls with Sirius XM representatives, Dkt. 42, Ex. 1 ("Brandt 2022 Call Tr."), Ex. 2 ("Brandt 2023 Call Tr."), Ex. 3 ("Carovillano Call Tr."), and emails sent to Brandt and Carovillano after they subscribed to Sirius XM, Dkt. 43, Ex. 7 ("Brandt 2022 Email"); Dkt. 46, Ex. 10 ("Brandt 2023 Email"); Dkt. 43, Ex. 10 ("Carovillano Email").

governed by the Sirius XM Customer Agreement" and provide a hyperlink to the agreement. *E.g.*, Brandt Email at 2; Carovillano Email at 2. Sirius XM also sends physical "Welcome Kits" to some customers in the mail, which include a hard copy of the Customer Agreement. Def. 56.1 ¶ 48.

As relevant here, the Customer Agreement contains a class action waiver provision stating: "You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim submitted to arbitration or litigation (to the extent you elect to Opt-Out of Arbitration)." Customer Agreement at 18.

### 2. Carovillano's Dealings with Sirius XM

Carovillano first signed up for Sirius XM service over the phone 10 years ago. From February 2014 to March 2023, Carovillano canceled and renewed his subscription six times over the phone. Def. 56.1 ¶¶ 7–8. Each time he received a confirmation email directing his attention to Sirius XM's Customer Agreement, accessible via a hyperlink. *E.g.*, Stephens Decl., Ex. 4 at 2 (Feb. 25, 2014: "See our Customer Agreement for complete terms."), Ex. 6 at 2 (July 6, 2015: "See our Customer Agreement for complete terms."), Ex. 7 at 2 (Dec. 11, 2019: "Your subscription is governed by the SiriusXM Customer Agreement . . . ."). In 2021, he was also sent a physical welcome kit, which included a copy of the Customer Agreement. Fried Decl., Ex. 3 at 2 (June 28, 2021: "See our Customer Agreement enclosed or online at www.siriusxm.com. Please be sure to read it.").

Carovillano most recently subscribed to Sirius XM over the phone on July 29, 2022. Def. 56.1 ¶ 8. In that call, Carovillano switched his subscription from a promotional rate that had recently expired. Carovillano Call Tr. 2–3. He was told that Sirius XM's "customer agreement, including the refund policy, can be found on [its] website" and that he "can request it any time

by phone." *Id.* at 4.  When asked if he "accept[ed] these terms," he replied, "Okay, yep." *Id.* at

5.  The relevant portion of the exchange went as follows:

> Representative:   [L]et's go over the details.  The monthly music and entertainment and promotional plan.  You chose [that plan] today and comes to $8.49 per month for the initial 12 months period which includes fees and taxes.  The first month is provided to 82 cents to align with the billing date on your account.
>
> Today's change generated a credit of $13.27, which will be applied to future charges on your account.  After your first 12 months beginning on August 1st, 2023, your subscription will automatically renew and bill every month at the current rates for an estimated total charge of $21.84 which includes fees and taxes.  You may cancel at any time by calling us at (866) 635-2349.
>
> You may see a renewal with a rated charge to align with the billing date on your account.  Your customer agreement, including the refund policy, can be found on our website [at] siriusxm.com or you can request it at any time by phone.
>
> If there is an e-mail address in your account, a confirmation of this transaction will be sent to that e-mail address within five days.  Do you accept these terms and may I have your permission to charge your card ending for future charges?
>
> Carovillano:      How -- how long is this trial for --
>
> Representative:   Sure.
>
> Carovillano:      -- for promotion plan.  12[?]
>
> Representative:   That's right.  12 months.
>
> Carovillano:      Okay, yep, you have permission.

*Id.* at 4–5.  That same day, Carovillano received an email from Sirius XM, confirming his new subscription and informing him, "Your subscription is governed by the SiriusXM Customer Agreement," available through a hyperlink.  Carovillano Email at 2.

4

The first half of that email (in which the Customer Agreement is referenced) is reproduced below:

((( SiriusXM )))

This email confirms your recent SiriusXM account transaction.

Thank you for selecting a new SiriusXM subscription. A summary of your activity for 07/29/2022 is below. If your radio isn't receiving service, please click here to refresh your signal. To begin streaming online, click here and input your SiriusXM username listed below.

**Account Details**
SiriusXM Account Number
SiriusXM Username
Radio ID/ESN                                              (2009 Ford FOCUS)
Streaming Username
Credit/Debit Card

**Today's Purchase Details**

| Package/Plan | Subscription Term | Charges |
|---|---|---|
| Sirius Music & Entertainment ($6.99/Month for 12 Months) | 07/29/2022 - 08/01/2022 | $0.68 |
| SiriusXM Video (1 Month) | 07/29/2022 - 08/01/2022 | $0.00 |
| U.S. Music Royalty Fee | | $0.14 |
| Previous Subscription Credit | | ($14.09) |
| Credit Applied to Your Account | | ($13.27) |

Charges shown above may have been prorated to align with your billing cycle. Additional adjustments made to your account after this purchase will not be reflected on this statement.

**Discount Renewal Charges**

For the remainder of your promotional period your monthly price will reflect savings through 08/01/2023. Changes to fees or your local/state tax rates could change the amount of these and other future charges.

| Package/Plan | Subscription Period | Estimated Charges |
|---|---|---|
| Sirius Music & Entertainment ($6.99/Month for 12 Months) | Monthly Beginning 08/01/2022 | $6.99 |
| SiriusXM Video (1 Month) | 08/01/2022 - 09/01/2022 | $0.00 |
| U.S. Music Royalty Fee | | $1.50 |
| Current Charges | | $8.49 |

**Important Automatic Renewal Information For All Subscriptions**

For your convenience, when your promotional period is over, your subscription(s) will automatically renew and be charged thereafter for additional periods as stated below starting on 08/01/2023 at the rates in effect at the time of each renewal. Your subscription is governed by the SiriusXM Customer Agreement, where you can find our refund policy and details on how to cancel, which includes using our online Chat feature or calling us at 1-866-687-4213.

**Renewal Charges**

| Package/Plan | Subscription Period | Estimated Charges |
|---|---|---|
| Sirius Music & Entertainment | Monthly | $17.99 |
| SiriusXM Video | Monthly | $0.00 |
| U.S. Music Royalty Fee | | $3.85 |
| Total Charges | | $21.84 |

All future terms will be charged to the credit/debit card that we have on file for you. Actual charges may reflect changes to your account such as the number of radios, type of plan or package or service adjustments. In addition, charges may also be prorated to your billing cycle and may reflect changes to our subscription rates, fees or your local/state tax rates.

5

*Id.*

On March 10, 2023, Carovillano canceled his subscription for the final time via webchat through the Sirius XM website. Def. 56.1 ¶ 8.

### 3.  Brandt's Dealings with Sirius XM

Brandt has been a Sirius XM subscriber since 2017. He has remained a subscriber, with only minor interruptions, and continues to be one today. *Id.* ¶ 14. He has received at least nine confirmation emails—one for each time he called to renew his service or otherwise made a payment. *Id.* ¶¶ 15, 17, 19, 21, 23, 25, 29, 31, 35. Each email either informed Brandt that his "subscription is governed by the SiriusXM Customer Agreement," accessible via a hyperlink, Narasimha Decl., Ex. 1 at 2 (March 24, 2020), Ex. 2 at 2 (May 7, 2020), Ex. 6 at 2 (June 25, 2022), Ex. 7 at 2 (Dec. 27, 2022), or told Brandt to "[s]ee [the] Customer Agreement for complete terms at www.siriusxm.com," Narasimha Decl., Ex. 3 at 3 (July 10, 2021), Ex. 4 at 2 (Dec. 24, 2021), Ex. 5 at 3 (Feb. 8, 2022).[2]

On December 27, 2022, after receiving a promotional mailer, Brandt called Sirius XM to switch to a new subscription. Def. 56.1 ¶ 27. Like Carovillano, Brandt was told that Sirius XM's "customer agreement, including the refund policy, can be found on [its] website" and that

---

[2] In his deposition, Brandt at first testified that he had "never received a confirmation e-mail" from Sirius XM, at least "[t]o [his] knowledge," Brandt Dep. 30, but then conceded that he "may" have received such emails, *id.* at 104. Brandt's equivocation does not create a genuine issue of fact as to whether these emails were in fact sent. "It is well settled that the party opposing summary judgment may not create a triable issue of fact 'merely by submitting an affidavit that disputes his own prior sworn testimony,'" *Risco v. McHugh*, 868 F. Supp. 2d 75, 108 (S.D.N.Y. 2012) (citation omitted), or by submitting an affidavit that "contradict[s] factual allegations in his complaint" or other pleadings, *Moscatelli v. Owl's Nest, Inc.*, 554 F. Supp. 3d 437, 444 (E.D.N.Y. 2021) (citation omitted). In his sworn interrogatory response, Brandt admitted "receiv[ing] an initial signup email," Stephens Decl., Ex. 3 at 8, and in the Complaint, Brandt alleged that he "received or was directed to the same uniformly-worded documents, emails, and/or websites," Compl. ¶ 14. No reasonable juror could interpret Brandt's ambivalent testimony to cast doubt on the accuracy of Sirius XM's business records.

6

he "can request it any time by phone." Brandt 2022 Call Tr. 5. When asked if he "accept[ed] this [sic] terms," he replied, "Yes." *Id.* at 6. The relevant portion of the exchange went as follows:

| | |
|---|---|
| Representative: | In order for me to finalize this transaction, I will go in to discuss now the terms and conditions. After this, I need to get your clear yes of your verbal agreement. |
| Brandt: | Yes. |
| Representative: | Let's go over the details. The six months, sir, XM usage entertainment plan, you chose to start today. Your bill is $43.70 for the initial billing period, which includes patient [sic] taxes. Your service will automatically renew on June 27th, [2023]. Your renewal will bill every six months at the current rate for an estimated total charge of $131.04, which includes fees and taxes. You may cancel at any time by calling us at (866) 635-2349. Your first invoice will be emailed today and it's due upon [receipt]. You will receive an invoice for future charges.<br><br>Your customer agreement, including the refund policy, can be found on our website [at] siriusxm.com or you can request it at any time by phone. If there is an e-mail address on your account, a confirmation of this transaction will be sent to that e-mail address within five days. Do you accept this [sic] terms and may I have your permission to send you an invoice today for $43.70 and for future charges to the e-mail address on file? |
| Brandt: | Send me the invoice. I do not want auto renew though. |
| Representative: | Sir, all our plans here is set to automatic renewal but like what I have mentioned, there's no need to worry because you are the boss on your account. You can always make any changes or adjustments anytime you want, okay? |
| Brandt: | Okay. |
| Representative: | So again, Steven, do you accept this [sic] terms and may I have your permission to send you an invoice today for $43.70 and for future charges to the e-mail address on file? |
| Brandt: | Yes. |

7

*Id.* at 4–6. That same day, Brandt received an email from Sirius XM—essentially identical to the one Carovillano received—confirming his new subscription, and informing him, "Your subscription is governed by the SiriusXM Customer Agreement," available through a hyperlink. Brandt 2022 Email at 2.

A few months later, on May 27, 2023, Brandt called Sirius XM to transfer his subscription from one vehicle to another. Def 56.1 ¶ 33. He was once again told that he "can find [his] customer agreement" on SiriusXM's website. Brandt 2023 Call Tr. 7. When asked whether he "accept[ed] these terms," he first sought to confirm the billing period, but then agreed. *Id.* at 8. The relevant portion of the exchange went as follows:

> Representative: I will read some details about the process that we are let me know doing and if you have any questions, please at the end.
>
> . . . [L]et's go over the details. If there is a e-mail address on your account, a confirmation there of the transaction will be sent to that e-mail address between five days. You can also find your customer agreement on our website at siriusxm.com or you can request it at any time by form [sic]. There is a previous credit of $8.51, which will remain on your account for any future billing activities. The five month Sirius XM music and entertainment plan you choose, start [sic] at the end of your trial on August 19th, 2023. Your bill is $30.34 for the initial period, which includes fees and taxes.
>
> Any credit on your account at the time your plan is billed will be applied against your new charges. Your service will automatically renew on January 19th, 2024. Your renewal will bill every three months, and then current rate for an estimated total charge of $69.16, which includes fees and taxes. You may cancel at any time by calling us at (866) 635-2349. Do you accept these terms and may I have your permission to send you an invoice for $30.34 minus any credits on -- at the end of your trial on August 19th, 2023 and for future charges to the e-mail address on file?
>
> Brandt: So you want -- you're going to send that to me, the thing in -- for -- in January for the --

8

| | |
|---|---|
| Representative: | Oh, the next payment will be at the end of the trial, the $30.34 minus the $8. |
| Brandt: | Okay. And that will be for the six -- that will be for the six month period, correct? |
| Representative: | It will be for the next five months until January 19th, 2024. |
| Brandt: | Okay. |
| Representative: | So can I take that as a yes? |
| Brandt: | Yes. |

*Id.* at 7–8. That same day, Brandt again received an email from Sirius XM—essentially identical to the one he had received in December 2022—confirming his new subscription, and informing him, "Your subscription is governed by the SiriusXM Customer Agreement," available through a hyperlink. Brandt 2023 Email at 2.

### B. Procedural History

On June 5, 2023, plaintiffs filed this putative class action alleging that Sirius XM failed to properly disclose certain fees. Dkt 1. On February 6, 2024, the Court denied Sirius XM's motion to dismiss. Dkt. 21, 2024 WL 450040. Discovery commenced on February 26, 2024. Dkt. 29 (case management plan).

On May 24, 2024, pursuant to the case management plan, Sirius XM moved (1) for partial summary judgment as to plaintiffs' ability to pursue class litigation and (2) to strike plaintiffs' class allegations, Dkt. 39, and filed a memorandum of law in support, Dkt. 40 ("Def. Br."). On June 14, 2024, plaintiffs opposed Sirius XM's motion. Dkt. 47 ("Pl. Br."). On July 8, 2024, Sirius XM filed a reply brief. Dkt. 51 ("Def. Reply Br.").

## II. Applicable Legal Standards

### A. Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a

reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

      **B.**      **Motions to Strike Class Allegations**

Under Federal Rule of Civil Procedure 23(d)(b)(D), a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." This rule "permits courts to 'order deletion of portions [of] a complaint's class claims once it becomes clear that the plaintiffs cannot possibly prove the deleted portion of those claims,' at least where the basis for the motion to strike is distinct from the factors the court would consider on a motion for class certification." *Barrett v. Forest Laboratories, Inc.*, 39 F. Supp. 3d 407, 458 (S.D.N.Y. 2014) (citation omitted). "The provision is not merely an opportunity to tidy-up pleadings, but has a substantive component because it further provides that the order may provide that 'the action proceed accordingly,' *i.e.*, as an individual action." *Grant v. N.Y. Times Co.*, 329 F.R.D. 27, 31 (S.D.N.Y. 2018).

**III.**      **Discussion**

Sirius XM argues that plaintiffs waived their ability to proceed as class representatives pursuant to the Customer Agreement. Plaintiffs respond that (1) a genuine dispute of material fact exists as to whether they are bound by the Customer Agreement, and (2) even if they are bound, the class action waiver applies only in the context of class arbitration, rather than class litigation. The Court considers each argument in turn.

      **A.**      **Applicability of the Customer Agreement**

Under New York law, which governs here, a contract is formed when there is a "meeting of the minds" and "a manifestation of mutual assent." *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). Assent may be manifested by words or conduct. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427–28 (2d Cir. 2004); *see also* Restatement

11

(Second) of Contracts § 69(1)(a) (1981).  A party may be bound to contract terms incorporated by reference, even if he has not read them, so long as he is given reasonable notice that such terms exist and are intended to be part of the agreement.  *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11 (1988); *see also, e.g.*, *Register.com*, 356 F.3d at 403.  The key question is whether a reasonably prudent person would understand that he was agreeing to the incorporated terms.  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289, 294 n.11 (2d Cir. 2019); *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (additional contract terms incorporated by reference if "so referred to and described . . . that the paper [with those terms] may be identified beyond all reasonable doubt" (citation and emphasis omitted)).

The Court finds that there is no genuine dispute of material fact as to whether plaintiffs are bound by Sirius XM's Customer Agreement.  Simply put, plaintiffs expressly agreed to be bound by the Customer Agreement.  A reasonably prudent consumer in plaintiffs' position would have understood that by verbally assenting to "these terms" during the phone sign-up process, he was agreeing to be bound by the full Customer Agreement referenced by the Sirius XM representative.

Plaintiffs' verbal assent to the Customer Agreement disposes of the issue of contract formation.  Plaintiffs were expressly told during each phone sign-up that the full Customer Agreement was available on Sirius XM's website and could be requested by phone.  Carovillano Call Tr. 4–5; Brandt 2022 Call Tr. Tr. 4–6; Brandt 2023 Call Tr. 7–8.  Plaintiffs were expressly asked by the Sirius XM representative whether they "accept[ed] these terms."  Carovillano Call Tr. 5; Brandt 2023 Call Tr. 8; *see also* Brandt 2022 Call Tr. 6 (asking whether Brandt "accept[ed] this [sic] terms").  Not only were these terms "reasonably conspicuous" to plaintiffs, *Nicosia*, 834 F.3d at 233, but plaintiffs were expressly required to verbally consent to them

12

before proceeding further with the transaction. The Customer Agreement was thus "clearly identified" by Sirius XM's customer representatives. *PaineWebber*, 81 F.3d at 1202. By requiring "potential [customers] . . . to expressly and unambiguously manifest either assent or rejection" prior to their purchase, *Register.com, Inc. v. Verio*, Inc., 356 F.3d 393, 429 (2d Cir. 2004), Sirius XM puts its subscribers on notice as to the existence of the Customer Agreement, whether or not subscribers choose to read it, *Gillman*, 73 N.Y.2d at 11.[3]

      No more is required to create a binding contract, as demonstrated by the well-settled law of "clickwrap" agreements. A clickwrap agreement is one in which a user is required to click a box to signify his or her assent to a merchant's terms of use or of sale. *See Register.com*, 356 F.3d at 429. "Because the user has 'signed' the contract by clicking 'I agree,' even commentators who have called for limits on browsewrap agreements"—which purport to apply even in the absence of any particular action on the part of the user—"find nothing inherently troubling about enforcing clickwrap licenses." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (cleaned up); *see also Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 639–44 (S.D.N.Y. 2020). As such, as the Second Circuit has explained, "courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (citing *Fetja*, 841 F. Supp. 2d at 837). As is often true in the

---

[3] The cases on which plaintiffs rely, like *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014), are thus inapposite. Pl. Br. at 10–12. In those cases, courts held that consumers who received trial subscriptions bundled with vehicle purchases were not bound by terms in welcome kits they later received. *See Knutson*, 771 F.3d at 565–66 ("no mutual assent to enter into the Customer Agreement" because plaintiff "was never given the opportunity to accept or reject the Agreement" before activating the free trial). Here, by contrast, plaintiffs actively signed up for paid subscriptions multiple times and were told about the Customer Agreement before agreeing to subscribe.

clickwrap context, it is likely the case that few users ever read the agreement at issue in this case. But the "touchstone of contract formation"—a "mutual manifestation of assent"—is still present here, as it is in the clickwrap cases. *Valelly*, 464 F. Supp. 3d at 640 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)). By verbally agreeing to Sirius XM's terms, plaintiffs bound themselves to the Customer Agreement.

Plaintiffs' two counterarguments are unpersuasive. First, plaintiffs contend that Sirius XM was required to compel its customers to expressly acknowledge (or perhaps even sign) the full Customer Agreement. Pl. Br. at 1 (noting it is "undisputed" that neither plaintiff "ever signed any customer service agreement" or otherwise "indicat[ed] their consent to any terms posted" on Sirius XM's website). But New York law does not rely on such formalities. Parties can agree to be bound by terms they have not read, and have not signed, so long as they are given reasonable notice that such terms exist and will apply. *See Starke*, 913 F.3d at 289. In *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997), Judge Easterbrook explained the practical underpinnings of this principle:

> Payment preceding the revelation of full terms is common for air transportation, insurance, and many other endeavors. Practical considerations support allowing vendors to enclose the full legal terms with their products. Cashiers cannot be expected to read legal documents to customers before ringing up sales. If the staff at the other end of the phone for direct-sales operations . . . had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers. Others would hang up in a rage over the waste of their time. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it.

*Id.* at 1149.[4] The fact that a consumer "did not read" a contract "and was unaware of its terms" does not afford him a basis upon which he may void it. *Gillman*, 73 N.Y.2d at 11.

---

[4] Courts in New York have often relied upon *Hill* as persuasive authority. *See, e.g.*, *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 571–72 (1998) (noting that although *Hill* is "not

Second, plaintiffs argue that they believed they were only agreeing to the specific terms discussed on the phone—the price, the plan, the billing period, and so on. Pl. Br. at 4–5 (describing Sirius XM's script as a "masterpiece of obfuscation," as "these terms" could refer to the "terms that were disclosed and discussed during the telephone sign up process," as opposed to the full Customer Agreement). But the standard is what a reasonably prudent person would understand, not what plaintiffs claim to have subjectively believed. *Meyer*, 868 F.3d at 74–75. For two reasons, no reasonable juror could adopt plaintiffs' interpretation. First, both plaintiffs were told: "Your Customer Agreement, including the refund policy, can be found on our website at siriusxm.com or you can request it any time by phone." Carovillano Call Tr. 4; Brandt 2022 Call Tr. 5; *see also* Brandt 2023 Call Tr. 7. In other words, in the same sentence in which the plaintiffs were told about the Customer Agreement, they were also put on notice that it contained terms beyond those explicitly discussed in the call—namely, Sirius XM's refund policy. Moreover, by informing plaintiffs where they could find and how they could request the Customer Agreement, the representatives clearly conveyed that the agreement contained additional terms for plaintiffs to review. Plaintiffs' "failure to read a duly incorporated document" does "not excuse the[ir] obligation to be bound by its terms." *PaineWebber*, 81 F.3d at 1201.

Second, it would defy common sense to believe that a satellite radio subscription would be governed by only the handful of terms discussed during a brief phone call. Essential aspects of the service—such as where and when it would work, whether new vehicles could be added, which channels were part of the subscription, and how disputes between the parties would be

---

controlling," the court "agree[s] with [its] rationale" as it is consistent with "the law of New York"); *see also Register.com*, 356 F.3d at 427–30 (citing *Hill* in elucidating New York law).

resolved—were not among the terms discussed on the calls. A reasonable consumer would expect such issues to be addressed in the full Customer Agreement repeatedly referenced by Sirius XM—and would not expect such an agreement to contain only six terms. *Cf. Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) (a reasonable consumer "is neither irrational nor a dolt"). The representatives' statements unmistakably pointed to the existence of a more comprehensive agreement and sought plaintiffs' assent to it in its entirety. Under the circumstances at issue here, a reasonably prudent person would understand that he was agreeing to be bound by the full Customer Agreement.

Because a reasonable juror would be compelled to conclude that plaintiffs agreed to bound by the Customer Agreement, the Court finds that plaintiffs are bound by the Agreement.[5]

### B.   Applicability of the Class Action Waiver

Having found that plaintiffs agreed to the Customer Agreement, the Court finds that its class action waiver bars plaintiffs from pursuing their claims on a class-wide basis.

The class action waiver states that subscribers may not "act as a class representative or participate as a member of a class of claimants with respect to any Claim submitted to arbitration or litigation (to the extent you elect to Opt-Out of Arbitration)." Customer Agreement at 18. The waiver unambiguously prohibits both class arbitration and class litigation.[6]

---

[5] Given the Court's holding that plaintiffs' verbal assent was sufficient to bind them to the Customer Agreement, the Court does not have occasion to reach Sirius XM's other arguments on this point, including whether Sirius XM's confirmation emails would, on their own, justify application of the Customer Agreement. *Cf. Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197–98 (2d Cir. 2015) (enforcing forum-selection clause against plaintiff who was informed of terms and conditions only in promotional brochure and post-purchase emails).

[6] Plaintiffs do not contend that this term is unconscionable or otherwise in conflict with New York law—rightly so. *See Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009) ("Courts applying New York law . . . have uniformly held that class action waivers are not unconscionable." (cleaned up)). And plaintiffs do not contend that the subject-

Plaintiffs argue that the parenthetical "(to the extent you elect to Opt-Out of Arbitration)" means the litigation waiver would apply only if they formally opted out of arbitration, which they did not do. Pl. Br. at 22–25. That interpretation is unpersuasive. The parenthetical does not create a condition precedent for the waiver to take effect—it merely clarifies why "litigation" is mentioned in an agreement that generally requires arbitration. That reading is confirmed by the opt-out provision itself, which states that, even if a customer opts out of arbitration, "[a]ll other terms of this Agreement *will continue* to apply to your Service, including . . . the Class Action Waiver"—that is, that the waiver was *already* effective before the customer opted out. Customer Agreement at 17 (emphasis added). Plaintiffs' reading would also lead to the nonsensical result that customers who breach their promise to arbitrate would be free to pursue class litigation, while those who properly opt out would be bound by the class action waiver. The Court declines to interpret the contract in a way that would reward breach. *See Indovision Enterprizes, Inc. v. Cardinal Export Corp.*, 354 N.Y.S.2d 113, 115 (1st Dep't 1974), *aff'd*, 36 N.Y.2d 811 (1975) ("A provision that allows either party by his own breach to excuse his own performance is a commercial absurdity.").

Accordingly, the Court finds that the class action waiver in the Customer Agreement is enforceable and bars plaintiffs from pursuing their claims on a class basis.

## CONCLUSION

For the foregoing reasons, the Court grants Sirius XM's motion for partial summary judgment. Plaintiffs' class allegations are stricken, pursuant to Rule 23(d)(1)(D). This case shall proceed solely as to plaintiffs' individual claims.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket 39.

---

matter of this suit, which relates to Sirius XM's alleged failure to disclose certain fees charged as part of its subscriptions, Compl. ¶¶ 1–12, falls outside the scope of the class action waiver.

SO ORDERED.

/s/ Paul A. Engelmayer
PAUL A. ENGELMAYER
United States District Judge

Dated: July 18, 2024
       New York, New York